Kenneth GRANVIEL,
Petitioner-Appellant,

v.

W. J. ESTELLE, Jr., Director, Texas
Department of Corrections, et al.,
Respondents-Appellees.

No. 79–1332.

United States Court of Appeals,
Fifth Circuit.

Sept. 11, 1981.
Rehearing Denied Oct. 13, 1981.

Frank W. Sullivan, III, Fort Worth, Tex., (Court-appointed) for petitioner-appellant.

Jack Greenberg, James M. Nabrit, III, Joel Berger, John Charles Boger, Deborah Fins, New York City, Anthony G. Amsterdam, Stanford Univ. Law School, Stanford, Cal., for amicus curiae NAACP.

Leslie Benitez, Asst. Atty. Gen., Austin, Tex., for respondents-appellees.

Before AINSWORTH and HENDERSON, Circuit Judges, and HUNTER *, District Judge.

HENDERSON, Circuit Judge:

The appellant, Kenneth Granviel, was convicted in the 213th Judicial District Court of Tarrant County, Texas, of the capital murder of two-year old Natasha McClendon and received the death sentence. The Texas Court of Criminal Appeals affirmed the conviction, *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977), as well as the subsequent denial of state habeas corpus relief, *Ex Parte Granviel,* 561 S.W.2d 503 (Tex.Cr.App.1978). Granviel then filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Texas. The case was transferred to the Northern District of Texas, Fort Worth Division, where the petition was denied. This appeal followed.

The gruesome details of the multiple rapes and murders which resulted in Granviel's conviction are fully explicated in the first opinion of the Texas Court of Criminal

Appeals, 552 S.W.2d at 110–12. Hence, we gladly refrain from repeating them here. Suffice it to say that altogether, and in the course of two separate killing sprees, Granviel raped four women and stabbed to death five women and two children. He fully confessed to these crimes and relied solely on the defense of insanity at trial.

On this appeal, Granviel seeks habeas relief on four distinct grounds. We consider the problems he raises seriatim.

Granviel first maintains that the Texas capital sentencing statute, as applied in this case, violated his rights under the Eighth and Fourteenth Amendments. The bifurcated procedure employed by Texas courts in the trial of capital offenses is set out in Tex.Code Crim.Pro.Ann. art. 37.071. Under this system, the jury first decides the question of guilt or innocence. In the event of a guilty verdict, a separate sentencing proceeding is held in which additional aggravating and mitigating evidence may be introduced. The jury then answers the following questions on the basis of the evidence adduced at both phases of the trial:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. (Not applicable in this case.)

Art. 37.071(b). The state must prove each issue submitted beyond a reasonable doubt. Art. 37.071(c). If the jury answers each of these questions affirmatively, the death penalty is mandatory under the terms of the statute. A life sentence is required if the jury responds "no" to any one question.

* District Judge of the Western District of Louisiana, sitting by designation.

Art. 37.071(e).[1]  In Granviel's case, the jury answered "yes" to the first and second questions and, accordingly, the trial court imposed the death sentence.

■ Granviel specifically contends that this sentencing procedure, as applied in his particular case, did not allow the jury to consider *as a mitigating factor* the evidence of his mental instability.  Rather, his mental abnormality renders him a dangerous person who would admittedly "constitute a continuing threat to society" for purposes of answering the question contained in art. 37.071(b)(2).  Therefore, according to Granviel, having failed to persuade the jury on the insanity defense, the evidence of his mental condition could only possibly have served as an aggravating factor at the penalty phase of the trial.[2]

The Supreme Court has made quite clear that the sentencing authority in a capital case may "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973, 990 (1978) (emphasis in the original); *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).  With this standard in mind, the Court held, in response to a similar challenge to art. 37.071(b), that the second statutory question, as construed by the Texas Court of Criminal Appeals, "al-

low[ed] the defendant to bring to the jury's attention whatever mitigating circumstances he may be a able to show."  *Jurek v. Texas*, 428 U.S. 262, 272, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929, 939 (1976).  One such mitigating factor enumerated by the Texas court in its opinion in the *Jurek* case was "whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand."  *Jurek v. State*, 522 S.W.2d 934, 939–40 (Tex. Cr.App.1975).

In the instant case, the Texas Court of Criminal Appeals met squarely Granviel's particular challenge to the statute, concluding:

> Moreover, the jury in answering the special issues may properly consider all the evidence adduced during both the guilt and punishment phases of the trial.  This could include evidence of a defendant's mental condition—whether such evidence be characterized as an 'aggravating' or 'mitigating' factor.  Thus, Article 37.071(b), supra, does not prevent the jury from considering a defendant's mental condition as a mitigating factor.

561 S.W.2d at 516.

While we agree that the evidence of Granviel's mental condition, when channeled through the second statutory inquiry, most likely had an aggravating *result* in his individual case, we do not believe that the jury was absolutely precluded from *con-*

---

1.  An affirmative answer requires unanimity, whereas ten of the twelve jurors may return a negative answer.  Art. 37.071(d).

2.  Neither the prosecution nor the defense presented additional evidence at the sentencing stage.  Instead, both sides chose to rely on the record made during the trial on guilt or innocence.

    The evidence of Granviel's mental disturbance was by no means insubstantial.  As a child, he attempted several times to burn down his mother's house.  His younger brother often observed him tying pillows with strips of rags to simulate the body of a woman and then "having sex with them."  At times, he tried to force his brother into performing homosexual acts with him.  When he was sixteen, Granviel

beat and attempted to rape his mother, threatening to kill her, his younger brother and himself.  Thereafter, he was sent to Gatesville State School for Boys, where he described to a psychiatrist his pleasure at sticking knives into meat and "watching the blood squirt" while working in the school kitchen.  A few years after his release from Gatesville, Granviel jumped out of a tree onto his girlfriend and later hung her by her heels over a banister while threatening to drop her.  Approximately two weeks before the first set of murders, he stood on the same girl's stomach, beat and raped her at gunpoint.  One psychologist who testified for the defense diagnosed Granviel as a paranoid schizophrenic.

*sidering* this evidence in mitigation. Indeed, taking a quite different tack from that used here, defense counsel stressed the following point during closing argument at the penalty phase of the trial:

> Mr. Strickland has told you the Defendant's sanity is no longer an issue and I agree. You have made up your mind on that point, but it is not true that the state of his mind, his mental condition is still an issue, not so far as a defense of insanity, but there is not any witness who testified in this case who led you to believe that there was nothing wrong with this man. If he is a sociopath, you heard Dr. Methner—they burn out. Sociopaths burn out. It's a deep disease of youth. It is a personality disorder of youth.
>
> Dr. Methner also said this man could benefit from psychiatric help.

R. 3275–76. Moreover, Granviel proffered a similar argument on his direct appeal to the Texas Court of Criminal Appeals. There, he maintained that because of his "antisocial personality disorder," the evidence should be considered *insufficient* to support the jury's affirmative answer to the second statutory question.

We also disagree with Granviel's suggestion that art. 37.071(b)(2) is the only statutory question relevant to our investigation.[3] Art. 37.071(b)(1) requires the jury to decide whether the defendant acted *deliberately* and with the reasonable expectation that death would result. This inquiry seems to be the better vehicle for the concept of mitigation which is of primary importance to Granviel, i.e., that mental disorder lessens moral culpability.

It is true, as the NAACP maintains in its *amicus curiae* brief, that a "yes" answer to the first statutory question logically follows from a conviction of capital murder. *See* Tex.Penal Code Ann. § 19.03. However, such is not necessarily the case. The Texas Court of Criminal Appeals explains the inconsistency as follows:

> [A] jury having found that a defendant intentionally committed a capital murder to be consistent would have to find that the act was deliberately done. However, the inconsistent answer to the question Art. 37.071(b)(1) reflects only that the jury did not want the death penalty assessed.

*Blansett v. State*, 556 S.W.2d 322, 327 n.6 (Tex.Cr.App.1977). Similarly, in *Brown v. State*, 554 S.W.2d 677 (Tex.Cr.App.1977), the Texas court rejected the contention that art. 37.071(b)(1) requires the same finding as a determination of guilt under § 19.03.

It is not inconceivable that a jury, having found the requisite intent for a conviction of capital murder and having rejected the insanity defense, may yet conclude that, because of evidence of mental disturbance, a defendant's acts should not be deemed sufficiently deliberate to warrant the death penalty. Here again, we note that Granviel propounded a similar argument on his first appeal, where he maintained that the murder of Natasha McClendon "occurred in a frenzy" and that there was insufficient evidence that it was done deliberately. 522 S.W.2d at 123. True, the Texas Court of Criminal Appeals did not agree with Granviel's reasoning. But the jury's affirmative answer to the question, and the appellate court's determination that the evidence was sufficient to support that response, do not

---

3. The Supreme Court based its decision in *Jurek v. Texas* on art. 37.071(b)(2), but stated with respect to the other statutory provisions:

> The Texas Court of Criminal Appeals has not yet construed the first and third questions ...; thus it is as yet undetermined whether or not the jury's consideration of those questions would properly include consideration of mitigating circumstances. In at least some situations the questions could, however, comprehend such an inquiry. For example, the third question asks whether the conduct of the defendant was unreasonable

in response to any provocation by the deceased. This might be construed to allow the jury to consider circumstances which, though not sufficient as a defense to the crime itself, might nevertheless have enough mitigating force to avoid the death penalty—a claim, for example, that a woman who hired an assassin to kill her husband was driven to it by his continued cruelty to her. We cannot, however, construe the statute; that power is reserved to the Texas courts.

428 U.S. at 272 n. 7, 96 S.Ct. at 2956 n. 7, 49 L.Ed.2d at 938 n. 7.

persuade us that the jury was precluded from *considering* the evidence of Granviel's mental instability as a mitigating factor. He is entitled only to this consideration. Given the Supreme Court's holding in *Jurek v. Texas* with respect to art. 37.017(b)(2), and our own understanding of the Texas court's construction of art. 37.071(b) as a whole, we conclude that the capital-sentencing statute is not unconstitutional as applied to Granviel.

■ As a second attack on the validity of his death sentence, Granviel asserts that five veniremen were improperly excluded for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[4] The *Witherspoon* rule has been the subject of much discussion since its pronouncement, *see, e. g., Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); *Marion v. Beto*, 434 F.2d 29 (5th Cir. 1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 646 (1971); *Burns v. Estelle*, 626 F.2d 396 (5th Cir. 1980) (en banc), and we do not delve into its intricacies here. Briefly stated, *Witherspoon* provides that a venireman may be excused for cause only if he is "irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." 391 U.S. at 522 n.21, 88 S.Ct. at 1777 n.21, 20 L.Ed.2d at 785 n.21. The state retains the right to exclude only those veniremen who

> ma[k]e unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Id.* (emphasis in original).

Of the five veniremen whose exclusion Granviel challenges,[5] the district court held, in accordance with the magistrate's recommendation, that one venireman, Donald L. Harrison, was improperly excused for cause for merely voicing conscientious scruples against the death penalty. We, too, believe that Harrison's exclusion for cause constituted a *Witherspoon* violation.[6] He was first asked whether he had conscientious scruples against the infliction of the death penalty, whereupon he stated, "I don't know what that means." When asked if he could ever vote to inflict the death penalty, he replied, "No, I don't *think* I could." Then, in response to the question, "You just don't *feel* like you would be entitled to take another person's life in that fashion?" He nodded and then said, "No, I could not." These questions and answers fall far short of an affirmation by Harrison that he would automatically vote against the death penalty regardless of the evidence, or that his objections to capital punishment would prevent him from making an impartial decision as to guilt.

This court recently reaffirmed its commitment to ensuring strict adherence to the mandates of *Witherspoon* in *Burns v. Estelle*, 626 F.2d 396 (5th Cir. 1980) (en banc). There, we explained the improper exclusion of a prospective juror as follows:

> [T]hree times in succession Mrs. Doss stated that she did not believe in the death penalty, following with an affirmation that it would affect her deliberations

---

4. The Supreme Court recently upheld the applicability of *Witherspoon* to Texas' bifurcated procedure. *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We note that Tex.Penal Code Ann. § 12.31(b), the statute which was held in *Adams* to have been improperly used as an independent basis for the exclusion of prospective jurors, is not in issue here.

5. The relevant voir dire examination of each of these veniremen—Donald L. Harrison, Homer N. Lipscomb, Inez Wallace, Mrs. Roy I. Cox and Mattie D. Vernon—is reproduced in the Appendix.

6. We express no opinion as to the propriety of striking prospective jurors Lipscomb, Wallace, Cox, and Vernon.

on any issue of fact in the case. These are strong expressions indeed, but they fall short of unequivocal avowals disqualifying her under either aspect of *Witherspoon's* two-pronged test. . . .

626 F.2d at 397–98. Mr. Harrison's equivocation differs slightly in kind from that of Mrs. Doss, but is certainly of no lesser degree. While Mrs. Doss stated that the possibility of the death penalty would "affect" her deliberations on any issue of fact, Mr. Harrison made no such representations and, indeed, was never questioned as to whether his attitude toward the death penalty would prevent him from making an impartial determination as to guilt. Further, Mrs. Doss' repeated disclosures that she did not believe in the death penalty were no less indicative of an automatic vote against the imposition of capital punishment than was Mr. Harrison's statement that he did not feel that he would be entitled to take another person's life.

◾ Normally, our determination that veniremen Harrison was improperly excused would conclude our inquiry; for if just one prospective juror is struck for reasons insufficient under *Witherspoon*, the death penalty must be set aside. *Davis v. Georgia, supra; Marion v. Beto, supra.* However, in the instant case, the district court, again following the magistrate's recommendation, held that defense counsel's failure to contemporaneously object to the improper exclusion amounted to a waiver of the *Witherspoon* error.

The Supreme Court established in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), that a state procedural waiver of a constitutional claim bars federal habeas corpus review absent a showing of "cause" and "prejudice." The prejudice resulting from the exclusion of a juror in violation of *Witherspoon* can hardly be questioned in light of decisions such as *Davis v. Georgia* and *Marion v. Beto*. Granviel maintains that the cause for the failure to object was the reliance by defense counsel on Texas case law which, at the time of his trial, indicated that a contemporaneous objection was not a prerequisite to the subsequent assertion of a *Witherspoon* error. It would seem, however, that the absence of a state contemporaneous objection rule would render the *Sykes* issues irrelevant. Thus, we turn to Granviel's contention that there was no such rule in Texas in October of 1975.

In *Tezeno v. State*, 484 S.W.2d 374 (Tex. Cr.App.1972), the Texas Court of Criminal Appeals entertained *Witherspoon* challenges to the exclusion of several jurors, including one whose voir dire examination was much the same as that of venireman Harrison.[7] The court concluded (incorrectly, we believe) that no violation occurred, but nevertheless reached the merits of the *Witherspoon* claim even though defense counsel had expressly stated that he had no objection to the challenge for cause. The court reasoned as follows:

> Waiver of objection apparently will not, in itself, vitiate an improper challenge. It is, however, a factor to be considered in cases such as the one at bar, where the exact meaning of a venireman's answer cannot be ascertained with total accuracy from the words of his answer alone.

484 S.W.2d at 383 n.2.

On April 30, 1975, the Texas Court of Criminal Appeals decided *Hovila v. State*, 532 S.W.2d 293 (Tex.Cr.App.1975), holding that several jurors were struck for reasons insufficient under *Witherspoon*. Defense counsel had voiced no contemporaneous ob-

---

7. Do you have any conscientious scruples against the assessment of death as a punishment for the crime of murder, in a proper case, sir?

    A  Yes, sir, I do.

    Q  I take it, by your answer, then, that there are no facts or circumstances whatever, that would justify you, personally, in rendering a death verdict in a murder case?

    A  I don't believe I could.

    Q  All right. You're just absolutely opposed to that penalty, on conscientious grounds?

    A  Yes, sir.

    Q  Thank you, sir.

MR. BENNETT: We'll challenge for cause.

MR. CALDWELL: No objection, Your Honor.

THE COURT: All right. You're excused, Mr. Juror.

484 S.W.2d at 382–83.

jections to the improper exclusions, and yet the court did not even mention the possibility of waiver.

It was not until its decision in *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976), where it expressly overruled *Hovila* and *Tezeno*, that the Texas court held that the failure to object constituted a waiver of a *Witherspoon* claim. We cannot enforce against Granviel a contemporaneous objection rule that apparently did not even exist at the time of his trial.[8]

We must admit that we reach this result reluctantly and without great satisfaction. We obviously do not have here the situation perceived by Judge Goldberg in his opinion in *Jurek v. Estelle*, 593 F.2d 672 (5th Cir. 1979), now vacated by the decision of the court en banc, 623 F.2d 929 (1980) (*see* 5th Cir. Rule 17.) He concluded that Jurek's trial counsel was either ignorant of the *Witherspoon* holding or that he misunderstood it, thus explaining his failure to object to improper exclusions. Granviel's counsel was well-aware of the *Witherspoon* rule, as his objections to certain lines of questioning demonstrate.[9] He did, in fact,

object to the exclusion of Mattie D. Vernon on *Witherspoon* grounds.[10] As to the other challenged exclusions, defense counsel testified at the state habeas hearing that he deliberately chose not to object because he felt he was not required to do so under Texas law. We cannot condone such tactics. Indeed, we agree with the state's assessment that "[t]o fail to object when counsel perceives error is to undermine the integrity of the judicial process." However, faced with the apparent absence of a Texas contemporaneous objection rule at the time of Granviel's trial, and ever-mindful of the gravity of a *Witherspoon* transgression and the consequences of precluding its assertion, we decide that the error in excluding venireman Harrison was not waived. Accordingly, Granviel's death sentence cannot stand.

As his third ground of error, Granviel asserts that the allowance of certain psychiatric testimony at the guilt phase of the trial violated the attorney-client privilege and resulted in the deprivation of his Sixth Amendment right to effective assistance of counsel.[11] Since our resolution of this issue

---

8. The treatment given Granviel's *Witherspoon* claims on his direct appeal is somewhat confusing. The Texas court discussed the responses of each of the five veniremen, implying that exclusion of each was proper. Then, as to each one, (except Mattie D. Vernon, whose exclusion did elicit an objection) it cited *Boulware* in concluding no error was shown. 552 S.W.2d 112–14.

9. I'm going to object. That is an improper question, whether it would be in conflict with religious feelings.
   R.1058.
   . . . .
   I object. The most the State can demand is a person be willing to consider all the penalties.
   R.1059–60.
   . . . .
   I will object to that as being an improper question. The question is whether or not she would unequivocally and automatically vote against it in every case.
   R.1725.
   By the same token, the prosecutor and the trial judge were also cognizant of the need to comply with *Witherspoon*. Indeed, the observation made by Judge Gee in *Burns v. Estelle*, 592 F.2d 1297, 1302 (5th Cir. 1979), *reheard en banc*, 626 F.2d 396 (1980), is equally applicable

here: "[M]uch of the voir dire concerned the *Witherspoon* problem; the trial judge's comments and questions . . . clearly indicate that his attention was focussed upon it during the entire process of cutting the panel." In *Burns*, these factors militated against the finding of a waiver. The en banc opinion reaffirmed the panel's holding on the merits, thus implicitly approving the discussion of the waiver issue.

10. For the purpose of the record, I am going to object to the exclusion of Mrs. Mattie D. Vernon on the grounds her questions (sic) were less than unequivocal and never did she say she would automatically vote against the death penalty in every case . . . .
    R.1728.

11. We assume that Granviel employs this argument as an attack upon the conviction itself, and that it is not another challenge aimed solely at the validity of his death sentence. We note, however, that he does not specifically complain that the psychiatrist's testimony weakened his insanity defense, but rather that it damaged him in relation to the jury's determination under Art. 37.071(b)(2). And yet, our examination of the record reveals no testimony by Dr. Holbrook which touched directly on the issue of Granviel's future dangerousness.

is largely dependent on certain aspects of Texas law, we find the Texas Court of Criminal Appeals' analysis of the problem on Granviel's direct appeal most helpful, both as to the facts and the relevant state law:

Appellant contends that the attorney-client privilege was violated by the State's subpoenaing and calling to the witness stand psychiatrist John T. Holbrook, who was appointed to examine appellant at the request of appellant's court appointed counsel. Appellant contends that Dr. Holbrook was an agent of appellant's trial counsel because he was employed to assist them in the preparation of the defenses in the trial. The appellant's only defense is that he was insane at the time of the commission of the offense.

On the written request of appellant the court appointed Charles Dickens and Frank Sullivan, Esquires, practicing attorneys to defend him on February 13, 1975. Appellant's counsel then contacted Dr. Holbrook, a psychiatrist, some time before April 26, 1975, and requested him to examine appellant in the Tarrant County Jail. These examinations were made on April 26 and May 16, 1975. Present at both examinations were the psychiatrist, appellant and counsel. Dr. Holbrook stated that appellant satisfactorily communicated with him and responded to his questions during the examination.

On May 22, 1975, upon counsel's written motion, the trial court appointed Dr. John T. Holbrook 'to examine the defendant in the Tarrant County Jail at any and all times that are convenient both to Dr. John Holbrook and the Sheriff.' On the same date the court upon appellant's counsel's written notice appointed Dr. M. Jerold May to administer psychological tests to appellant at his office in Fort Worth, which tests were made at a later date. On August 9, 1975, upon the State's request the court appointed Dr. Hugh Brown, a psychiatrist, to examine appellant at the Tarrant County Jail. Dr. Brown wrote the court of his inability to examine appellant because appellant refused to talk to him without his counsel being present. Dr. John Methner, a court appointed psychiatrist requested by the State, testified that on April 13, 1975, when he tried to examine the appellant in the presence of his counsel, he was unable to do so because appellant refused to talk to him or cooperate for the examination. Counsel stated that he advised the appellant that he did not have to talk to the psychiatrist (Dr. Methner); however, the psychiatrist did get to observe appellant for a while.

Art. 46.02, Sec. 2(f), V.A.C.C.P., as amended August 30, 1971, and effective at the date of the appointment of Dr. Holbrook on May 22, 1975, provides:

'(1) The court may, at its discretion appoint disinterested qualified experts to examine the defendant with regard to his present competency to stand trial and as to his sanity, and to testify thereto at any trial or hearing in connection to the accusation against the accused . . .

\*     \*     \*     \*     \*     \*

(4) No statement made by the defendant during examination into his competency shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding no matter under what circumstances such examination takes place.

(5) Any party may introduce other competent testimony regarding the defendant's competency.'

Under this statute, the trial court's allowing Dr. Holbrook to testify was proper. '[A]ppoint disinterested qualified ex-

Rather, the import of his testimony was that Granviel suffered from no psychosis and that he was sane, within the legal definition, at the time of the commission of the offenses. As we mentioned previously, neither the prosecution nor the defense offered additional testimony at the separate sentencing phase of the trial. Also, the prosecutor's only reference to Dr. Holbrook's testimony during arguments at the penalty phase was that "Dr. Holbrook said he [Granviel] should be held accountable for what he did." R.3291.

perts to examine the defendant ...' clearly means that such expert is not appointed by the court as the expert of the State or the defense, but is the court's disinterested expert. He may appoint such expert at his discretion and without a motion therefore (sic), and either party may subpoena such witness. Therefore, no attorney-client privilege exists as to Dr. Holbrook.

In *Stultz v. State*, [Tex.Cr.App.], 500 S.W.2d 853, this Court said:

> 'A psychiatric examination *is not an adversary proceeding*. Its purpose is not to aid in establishment of facts showing that an accused committed certain acts constituting a crime; rather, its sole purpose is to enable an expert to form an opinion as to an accused's mental capacity to form a criminal intent.
>
> Because of the intimate, personal and highly subjective nature of a psychiatric examination, *the presence of a third party in a legal and non-medical capacity would severely limit the efficacy of the examination ...*' (Emphasis added.)

Compare *Walker v. State*, 19 Tex.Cr.R. 176 (1885). See also *Gholson v. State*, Tex.Cr.App., 542 S.W.2d 395 (1976).

Art. 46.03, Sec. 3, V.A.C.C.P. effective June 19, 1975, provides as follows:

> '(a) If notice of intention to raise the insanity defense is filed under Section 2 of this article, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting attorney, appoint disinterested experts experienced and qualified in mental health or mental retardation to examine the defendant with regard to the insanity defenses and to testify thereto at any trial or hearing on this issue, but the court may not order the defendant to a state mental hospital for examination without the consent of the head of the state mental hospital.
>
>  \*  \*  \*  \*  \*  \*
>
> (d) A written report of the examination shall be submitted to the court

within 21 days of the order of examination and the court shall furnish copies of the report to the defense counsel and prosecuting attorney. The report shall include a description of the procedures used in the examination and the examiner's observations and findings pertaining to the insanity defense.

 \*  \*  \*  \*  \*  \*

> (g) The experts appointed under this section to examine the defendant with regard to the insanity defense also may be appointed by the court to examine the defendant with regard to his competency to stand trial pursuant to Section 3 of Article 46.02 of this code, provided that separate written reports concerning the defendant's competency to stand trial and the insanity defense shall be filed with the court.'

Cf. Article 46.02, Sec. 3, V.A.C.C.P. (Incompetency to stand trial).

A procedural statute controls litigation from its effective date. *Wilson v. State*, Tex.Cr.App., 473 S.W.2d 532. The trial of the instant case was in October 1975, and Article 46.03, Sec. 3, supra, was then effective and controlling. *Wilson*, supra. Cf. *McCarter v. State*, [Tex.Cr.App.], 527 S.W.2d 296.

Articles 46.03 and 46.02, supra, negate the contention of appellant that the attorney-client privilege was violated. Both the State and appellant had the right to subpoena the psychiatrist and adduce his testimony at the trial. There is no difference in the result when the examinations were completed before the appointment was made, as in the instant case, and when a psychiatrist is appointed by the court and then makes his examination.

Communications between a physician and his patient are not privileged under Texas Law. Texas has no statute establishing the privilege and the courts invariably deny its recognition. See *Bonewald v. State*, 157 Tex.Cr.R. 521, 251 S.W.2d 255.

 \*  \*  \*  \*  \*  \*

There is no affirmative evidence in the instant case showing that Dr. Holbrook revealed any fact or communication between him and appellant showing that appellant committed a *crime of any nature.* The testimony shows to the contrary that Dr. Holbrook never communicated to anyone in the district attorney's office any such statements or facts, if any, resulting from the examinations he made of appellant as to his sanity or his competency. Therefore, Article 46.02, Sec. 2(f)(4), supra, and Article 46.03, Sec. 3, supra, have not been violated.

Appellant claims that Dr. Holbrook's examination was necessary to his defense of insanity and failure to request the examination would have been ineffective assistance of counsel. Appellant contends that by employing Dr. Holbrook he created an involuntary State's witness who gave testimony adverse to appellant relating to Special Issue No. 2 under Article 37.071(b)(2), V.A.C.C.P. In view of our previous discussion of the status of Dr. Holbrook as a disinterested expert witness under Articles 46.02, Sec. 2(f) and 46.03, Sec. 3, this contention is without merit.

552 S.W.2d at 114–17. (Emphasis in original.)

█ Granviel admits that, in order to prevail on this issue, he must establish that his conversations with Dr. Holbrook were protected within the attorney-client privilege as it exists in Texas. However, it is clear that under Texas law, as interpreted by the Texas Court of Criminal Appeals, the attorney-client privilege does not attach in this situation. Rather, psychiatrists or psychologists who examine a defendant with respect to competency or insanity are designated as "disinterested qualified experts." As such, they may be subpoenaed by either party and they are not, as Granviel suggests, agents of either defense counsel or the prosecutor.

We realize that several state courts have, indeed, adopted the rule advocated by Granviel. *See, e. g., Lindsay v. Lipson,* 367 Mich. 1, 116 N.W.2d 60 (1962); *San Francisco v. Superior Court,* 37 Cal.2d 227, 231 P.2d 26 (1951); *State v. Kociolek,* 23 N.J. 400, 129 A.2d 417 (1957). Also, the Third Circuit, faced with a remarkably similar set of facts, concluded that the attorney-client privilege should be recognized when a psychiatrist is secured by defense counsel for assistance in trial preparation. *United States v. Alvarez,* 519 F.2d 1036 (3d Cir. 1975).[12] However, it did so in the context of a direct appeal from a federal conviction. We are not here deciding the scope and appropriate application of the attorney-client privilege for federal criminal proceedings; hence, we are not at liberty to flatly agree or disagree with the Third Circuit rule. Rather, we must determine whether such a rule of privilege, though perhaps preferred, is constitutionally required.

█ In concluding that there is no such constitutional mandate, we substantially agree with the rationale of Judge Weinstein in his excellent and thorough opinion in *Edney v. Smith,* 425 F.Supp. 1038 (E.D.N.Y. 1976), *aff'd,* 556 F.2d 556 (2d Cir. 1977), a habeas corpus case which, for our present

12. The court analogized the case to *United States v. Kovel,* 296 F.2d 918 (2d Cir. 1961), where the Second Circuit held the privilege applicable to communications made to an accountant for the purposes of aiding counsel in preparing a defense. From there, it reasoned that the appellant had been denied effective assistance of counsel, as follows:

> The issue here is whether a defense counsel in a case involving a potential defense of insanity must run the risk that a psychiatric expert whom he hires to advise him with respect to the defendant's mental condition may be forced to be an involuntary government witness. The effect of such a rule would, we think, have the inevitable effect of depriving defendants of the effective assistance of counsel in such cases. A psychiatrist will of necessity make inquiry about the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot be used to furnish proof in the government's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness. 519 F.2d at 1046–47.

purposes, involved essentially the same facts.[13] Recognizing that the defendant might suffer prejudice as a result of the New York rule allowing the psychiatrist to testify, Judge Weinstein inquired as to whether "the balance drawn by New York is so detrimental to the attorney's effective representation of his client as to be prohibited by the Sixth Amendment." 425 F.Supp. at 1053.[14] He then answered this question negatively:

> We can only speculate that the New York rule results in substantial prejudice to criminal defendants.

> The statements by the defendant to his psychiatrist were not admitted to establish the fact of his having committed the murder, but only to establish a basis for the psychiatrist's evaluation of petitioner's sanity at the time of the offense.[15] Given this limited use, any possible prejudice may be balanced, within limits not exceeded in this case, by the strong counter-balancing interest of the State in accurate fact-finding by its courts.

> In sum, it seems undesirable at this time to canonize the majority rule on the attorney-psychiatrist-client privilege and freeze it into a constitutional form not amenable to change by rule, statute, or further case-law development.

425 F.Supp. at 1054.

We are especially driven to this outcome in this case where Granviel, at his counsel's urging, refused to cooperate with the experts who were appointed at the prosecution's request.[16] As other circuit courts have noted:

> It would be a strange situation, indeed, if first, the government is to be compelled to afford the defense ample psychiatric service and evidence at government expense, and, second, if the government is to have the burden of proof—and yet it is to be denied the opportunity to have its own corresponding and verifying examination, a step which perhaps is the most trustworthy means of attempting to meet that burden.

*United States v. Albright*, 388 F.2d 719, 724 (4th Cir. 1968), *quoting Pope v. United States*, 372 F.2d 710, 720 (8th Cir. 1967), *vacated and remanded on other grounds*, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). This court made a similar observation in the context of a federal prosecution:

> [T]he government will seldom have a satisfactory method of meeting defendant's proof on the issue of sanity except by the testimony of a psychiatrist it selects—including, perhaps, the testimony of psychiatric experts offered by him—who has had the opportunity to form a reliable opinion by examining the accused.

*United States v. Cohen*, 530 F.2d 43, 48 (5th Cir. 1976) (footnote omitted). Hence, we hold that Granviel is not entitled to habeas relief on the attorney-client and Sixth Amendment grounds.[17]

---

**13.** In *Edney*, the New York state court had not held, as the Texas court did here, that the attorney-client privilege was inapplicable, but rather that it had been waived by the mere assertion of the insanity defense. *People v. Edney*, 39 N.Y.2d 620, 385 N.Y.S.2d 23, 350 N.E.2d 400 (1976). As a practical matter, there would seem to be little difference in the effects of these two approaches.

**14.** Judge Weinstein noted that the *Alvarez* court, although using language "constitutional in tone," did not have a constitutional question before it.

**15.** In the instant case, Dr. Holbrook did not relate to anyone the statements made to him by Granviel, but only his expert opinion derived from the psychiatric examination.

**16.** In federal courts, such refusal could result in the exclusion of any expert testimony offered by the defendant on the issue of his mental state. *See* Fed.R.Crim.P. 12.2(d).

**17.** We note that the issues of the Fifth Amendment privilege against compelled self-incrimination and the Sixth Amendment right to counsel which underlie the Supreme Court's recent decision in *Estelle v. Smith*, —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), are not involved here. Granviel and his attorneys were certainly aware that the prosecution intended to call Dr. Holbrook as a witness and they knew of the conclusions and the expert opinion to which he would testify. Further, Granviel was in no way compelled to submit to the examination by Holbrook.

Granviel finally urges that he was deprived of his Sixth Amendment right of confrontation by the introduction of hospital records containing diagnostic opinions. These records were presented by the State to rebut defense evidence that Granviel had been hospitalized for insanity.

Texas recognizes the business records exception to the hearsay rule, Tex.Rev.Civ. Stat.Ann. art. 3737e, and applies it in criminal as well as civil cases, *Coulter v. State*, 494 S.W.2d 876 (Tex.Cr.App.1973). Granviel complains that the state did not strictly adhere to the procedural requirements of art. 3737e, and, further, that the diagnostic opinion in question lacked the requisite trustworthiness. However, at the trial, defense counsel merely objected to the admission of the evidence on the ground that it was "hearsay." The Texas Court of Criminal Appeals held this objection insufficient, 552 S.W.2d at 121–22, citing its previous opinions in *Forbes v. State*, 513 S.W.2d 72 (Tex.Cr.App.1974); *Williams v. State*, 531 S.W.2d 606 (Tex.Cr.App.1976) (objection must be contemporaneous); and *Bouchillon v. State*, 540 S.W.2d 319 (Tex.Cr.App.1976) (objection too general properly overruled). Granviel having failed to demonstrate "cause" and "prejudice" in connection with the inadequate objection, *see Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), habeas corpus relief was properly denied on this ground.

Accordingly, petitioner's death sentence must be set aside, and the judgment of the district court is reversed insofar as it leaves the death sentence in effect. In all other respects the judgment is affirmed. The case is remanded to the district court with directions that the State of Texas determine within a reasonable time whether (1) to conduct a new sentencing proceeding in the manner provided by state statute, or (2) to vacate petitioner's sentence and impose a sentence less than death in accordance with state law.[18]

18. *Marion v. Beto*, 434 F.2d 29 (5th Cir. 1970), *cert. denied*, 402 U.S. 906, 91 S.Ct. 1372, 28 L.Ed.2d 646 (1971).

AFFIRMED IN PART; REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

## APPENDIX
### DONALD L. HARRISON

Q: (By Prosecutor) The defendant in this case is charged with capital murder. There are only two punishments for the offense of capital murder and that is either death or life in the penitentiary.

Now, do you have conscientious scruples against the infliction of the death penalty as a punishment for crime?

A: I don't know what that means.

Q: Let me ask you if you, personally sitting as a Juror, could ever vote so as to inflict the death penalty?

A: No, I don't think I could.

Q: That is a definite prejudice or feeling that you have that you would not change? You just don't feel like you would be entitled to take another person's life in that fashion.

A: (Venireman nods.)

Q: Okay, you could not?

A: No. I could not.

MR. WILSON: We challenge, Your Honor.

THE COURT: The defense have any objections?

MR. DICKENS: We don't have any questions.

THE COURT: All right.

The Court feels that the State's challenge for cause is qualified in this cause and supported by the evidence.

You will be excused, then, Mr. Harrison. Thank you very much. (R. 711–12).

### HOMER N. LIPSCOMB

Q: (By Prosecutor) ... There are only two possible punishments for capital murder, and that is life or death.

Now, bearing in mind the fact that this is a capital murder situation, I will ask you whether or not you have any conscientious or religious scruples against the imposition of the death penalty in a proper case?

A: I'm not very religious but I do have. I am kind of against the death penalty.

Q: Kind of against the death penalty. I appreciate your candor, and of course that is why we need to ask you these questions.

When you say you are kind of against the death penalty, what do you mean by that?

A: I mean it would have to be, you know, I really don't know what I am, but I just wouldn't want to be a part of it.

Q: I understand that.

Of course, nobody thinks it's a very pleasant occasion, nobody thinks that it's something they would particularly want to do, but the question is, of course, whether or not you yourself could personally take part in making decisions which you knew would result in the death of a human being.

A: I don't think I would.

Q: You don't think you could?

Well, you understand I have no argument with that position, but it's necessary that we find out exactly how you feel about it.

Is what you are saying that you have personal and deep-seated feelings which would prevent you from rendering a decision which would result in the death of a person in any case whatsoever?

A: I don't feel like I am that kind of a judge.

Q: You don't think you could imagine any sort of case in which you feel the death penalty would be justified, then?

A: No.

Q: By that you mean you would automatically vote against the infliction of the death penalty, no matter what the facts were in a particular case?

A: I might consider it, but I automatically would right now.

Q: You would automatically vote against the imposition no matter what the trial would reveal?

A: Yes.

Q: And no matter what these facts reveal, no matter how terrible the crime might be, that would not be enough to cause you to set aside your personal deep convictions regarding this matter?

A: I wouldn't want that on my mind.

Q: And this is a firm conviction, I take it, from what you have said?

A: Yes.

Q: And it's the sort of conviction which you are not going to let anybody talk you out of, presumably something within yourself and of course you have to live with yourself and your convictions and it's something you believe in and you are not going to let anybody talk you out of that?

A: Yes.

Q: I appreciate you telling that, Mr. Lipscomb, and we do appreciate your candor.

MR. STRICKLAND: Your Honor, it's the position of the State these are sincere and deep seated convictions and as such we would challenge Mr. Lipscomb for cause.

THE COURT: The challenge is granted under the authority of *Witherspoon* in (sic) Illinois. (R. 809–11).

### INEZ WALLACE

Q: (By Prosecutor) ... I'd like to ask you now whether you personally have any conscientious or religious scruples against the imposition of the death penalty in a proper case?

A: Well, the truth. I don't know exactly how I feel in that way.

Q: Of course, I can understand that. It's a serious point, but it's something we need to talk about because obviously if we are only faced with two possible alternatives, we need to make sure we have jurors that are able to consider both of those alternatives.

Have you been able to give it some thought? Have you thought about this question, say, before you came over here on jury service?

A: Well, I do believe in the Bible and I don't think no one should kill anyone.

Q: Okay. Let's talk about that, if I may, for a while. You say, 'I believe in the Bible,' and you believe in the things that it teaches you and no one should kill. By that are you saying you don't feel that you could give consideration to the death penalty regardless of what the facts might show in a case?

A: Well, I believe I could do that.

Q: You believe you could consider the death penalty and you don't feel that would in any way conflict with your religious feelings; is that right?

MR. DICKENS: I'm going to object. That is an improper question, whether it would be in conflict with religious feelings. Certainly perhaps the death penalty might be.

THE COURT: Sustained.

MR. STRICKLAND: If I may make a statement to that. I think *Witherspoon* allows us to inquire as to whether they have religious scruples and that is the point of my inquiry.

THE COURT: I agree it is.

BY MR. STRICKLAND:

Q: Now, understanding that, I assume that no one would like to be involved in a death penalty situation, that is, it's not a pleasant task for anybody, you understand that, but what I need to know is whether you yourself could personally take part in a trial and personally make decisions which might result in the death of another human being?

A: I don't think I could.

Q: You don't think you could. Well, you understand I don't have any quarrel with that position. All we need to do is we need, if that is your conviction and those are your deep and sincere feelings, well, of course, you are certainly entitled to those.

Are you saying, then, you have a deep-seated feeling that would prevent you from being able to take part in rendering a death penalty?

A: Yes, sir, I just don't believe in it.

Q: You just don't believe in the death penalty? Regardless of what the facts are, you just don't believe people ought to take another person's life?

A: I don't know what else to say. I just don't . . .

Q: I understand, number one, it may be sincere feelings and number two, I realize it may be something you haven't really had to experience before. You have thought about it but you haven't had to say anything. Well, you have just told me you don't think you believe in the death penalty and question I would have is are your feelings of such a nature or are your feelings so deep that no matter what the facts were, you just would not be able to give another person the death penalty or consider it?

MR. DICKENS: I object. The most the State can demand is a person be willing to consider all the penalties. Your Honor, and I object for that reason, and the way he phrases that question.

THE COURT: Overruled.

BY MR. STRICKLAND:

Q: Should I ask the question again, or did you understand?

A: What was the question.

Q: Well, let me ask it this way: Are you saying that the feelings you have and what you have already told us about these feelings you have that people should not take another person's life, are those feelings such no matter what you heard in a trial like this, no matter what you heard, you could be able to even consider giving a person the death penalty? You would just say, 'No, I'm sorry. I am just not going to take part in that'?

A: I don't know. That is kind of hard.

Q: I understand.

Well, of course, you understand that both sides and of course the Defendant, also, need to know if you would just

automatically say you would not consider one of these, that is what we need to know and what is the purpose of us talking here this afternoon.

MR. SULLIVAN: Your Honor, I would object to this continual line of repetitive questioning. This Venirewoman has testified she could consider the death penalty if the facts warranted it; therefore the question of the Prosecutor is improper and repetitious.

THE COURT: Overrule the objection.

MR. SULLIVAN: Please note my exception.

BY MR. STRICKLAND:

Q: Now, you understand if that is the way you feel—as I indicated, I don't have any quarrel with the way you feel, but all we need to know is precisely how you do feel and if I misunderstood you, set me straight. I thought you said you did not feel that you could participate in a trial in which the death penalty might be inflicted upon somebody. Did I understand you right?

A: Well, I say that is just how I feel. I wouldn't like to participate in it.

Q: Let me ask you this: Nobody would like to, I figure nobody really would like to be involved in something like that, but could you be involved? Would you set aside your feelings and just say, 'Well, I'm going to go ahead anyway and do it,' or are those feelings so strong you'd say, 'Well, I am not going to be involved'?

A: I just don't think I could.

Q: And this is a pretty deep and firm conviction you have; is that correct?

A: (Venirewoman nods.)

Q: And you are not going to let anybody talk you out of that conviction, I presume? Is that pretty right? Something you believe in and you are just not going to let anybody talk you out of that? You are going to stand for what you believe in?

A: (Venirewoman nods.)

MR. STRICKLAND: Your Honor, the State would challenge for cause on the basis of the witness'es (sic) testimony.

THE COURT: Mrs. Wallace, I am sure you do feel very deeply about this. It's brought tears to your eyes; is that right?

VENIREWOMAN WALLACE: Yes.

THE COURT: All right.

I know it's not an easy thing for you to go through here. The challenge for cause is sustained.

Do you understand, Mrs. Wallace, nobody is unhappy with you.

You have been excused, Mrs. Wallace.

(Whereupon, Juror number thirty-six excused.)

MR. SULLIVAN: Your Honor, would the Court take judicial notice that Mrs. Inez Wallace was a Negro female?

THE COURT: Yes, the Court will. (R. 1057–63).

MRS. ROY F. COX

Q: (By Prosecutor) ... Now Mrs. Cox, the punishment for capital murder which is the offense that this Defendant is charged with is only one of two things and that is by confinement in the penitentiary for life or death in the electric chair, and I would like to ask you at the outset whether or not you have any conscientious scruples against the infliction of the death penalty as a punishment for crime in a proper case?

A: Yes, I do.

Q: Mrs. Cox, is that such a deep-seated feeling that you have that regardless of the facts in the case that you personally acting as a juror could never vote to assess the death penalty; is that correct?

A: That's correct.

Q: I take it, then, Mrs. Cox that because of these feelings that you have and you are entitled to them, that you would automatically exclude the death penalty from any case you were sitting on as a punishment? You just wouldn't do it?

A: I don't think I could with all due consideration.

Q: Regardless of the facts of the case, and I'm not trying to badger you about it, but regardless of the facts of the case you just couldn't do it; is that correct?

A: Well, I would feel I was contributing to a death and I think that is wrong.

MR. WILSON: Your Honor, we would challenge for cause.

THE COURT: Challenge is sustained.

Mrs. Cox, you are excused. You may go back home, now. (R. 1086–87).

### MATTIE D. VERNON

Q: (By Prosecutor) ... Do you have any conscientious scruples against the death penalty as a punishment for crime?

A: I don't know.

Q: Well, could you personally acting as a juror vote in such a way that the death penalty would be inflicted?

A: What do you mean?

MR. DICKENS: I will object to that as being an improper question. The question is whether or not she would unequivocally and automatically vote against it in every case.

THE COURT: Sustained.

Q: What we need to know is, Mrs. Vernon, whether you personally could ever vote to—in such a way that the death penalty would be inflicted or is your feeling such that you personally could not do that in any case?

A: I don't know. I will be honest. I don't know.

Q: Well, you see, the State is asking for the death penalty. That is why they made it known that we are asking for the death penalty.

MR. DICKENS: I am going to object. It's immaterial what they are asking for. It's whether or not she can consider all the punishment.

THE COURT: Overruled.

BY MR. WILSON:

Q: And the death penalty is one of the penalties that the law says can be voted by the jury in a capital case.

MR. SULLIVAN: Your Honor, I would object to that because the law doesn't say the death penalty can be voted by the jury. It's an incorrect statement of the law.

THE COURT: Overruled.

BY MR. WILSON:

Q: So, to be qualified as a juror you have got to be able to not just say if there is some punishment that the law allows, well, I just couldn't do that and if you couldn't, now is the time to tell us. There is a lot of people can't.

A: No, I don't guess I could because I mean a life is a life. You can't bring back a life. I just really don't know. I will be honest. I don't know.

Q: Yeah, but you think you couldn't because you could not bring back a life?

A: No, you couldn't.

Q: You would, then—you really would have religious, conscientious, or whatever you might call them, scruples against the death penalty, don't you?

A: Yes, I guess I would.

Q: Ma'am?

A: I just, I guess not. I really don't know. I will be honest, I don't know, because I have never been through this before. I don't know.

Q: I'm sorry. I thought you told me that a life was a life and you just couldn't be involved in taking a life even if it was by jury verdict.

A: Really I am serious. I just don't know.

Q: Well, as I say, Mrs. Vernon, I am sorry to have to push you, but we need to know and if you could not do that, why now is the time to tell us and there is nothing wrong with it whatsoever.

A: No, I couldn't.

Q: You could not?

A: No, sir.

Q: And that is—I appreciate your telling us and do you tell us no matter what kind of case it was if you were the juror you couldn't vote to give the death penalty?

A: No.

Q: Okay.

I take it, Mrs. Vernon, and that is an affirmative opinion that you have.

A: Yes.

Q: All right.

MR. WILSON: We challenge, Your Honor.

THE COURT: All right.

The challenge is allowed and granted on the basis of *Witherspoon versus Illinois*.

Mrs. Vernon, you are excused from jury service.

(Whereupon, Juror number sixty-five excused.)

MR. DICKENS: For the purpose of the record, I am going to object to the exclusion of Mrs. Mattie Vernon on the grounds her questions (sic) were less than unequivocal and never did she say she would automatically vote against the death penalty in every case and, I guess, on that grounds (sic) and I would further ask the Court to take judicial notice she was a black lady.

THE COURT: Objection is noted. Court does take judicial notice Mattie D. Vernon was a black female. (R. 1724–28).

HUNTER, District Judge, dissenting:

I dissent from the majority opinion, only insofar as it concludes:

"[T]hat Harrison's exclusion for cause constituted a *Witherspoon* violation."

The basic facts developed in the trial are set forth in the opinion of the Texas Court of Criminal Appeals in *Granviel v. State*, 552 S.W.2d 107, *cert. denied* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250. It is not disputed that Granviel, in two separate killing sprees, stabbed to death five women and two children. The sufficiency of the evidence to support the jury's verdict of guilty is not challenged by anyone.

*Witherspoon* involved a state procedure for selecting jurors in capital punishment cases, where the jury did the sentencing and had complete discretion as to whether the death penalty should be imposed. In this context the Court held that a state may not constitutionally execute a death sentence imposed by a jury culled of all those who reveal during voir dire examination that they had conscientious scruples against the death penalty. Most of the veniremen challenged for cause were excluded with no effort to ascertain whether their scruples would compel them to vote against capital punishment. The Court specifically defined the issue and noted:

It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt.

*Witherspoon v. Illinois*, 391 U.S. 510 at 513, 88 S.Ct. at 1772. The Supreme Court has considered *Witherspoon* in numerous cases since that original opinion was handed down in 1968.[1] The most recent expression of the Supreme Court is found in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In an opinion written by Justice White, the Court, in making reference to this line of cases, stated:

This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

The majority holds that venireman Donald L. Harrison's exclusion for cause constituted a *Witherspoon* violation. The opinion concludes:

---

1. *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

"These questions and answers fall far short of an affirmation by Harrison that he would automatically vote against the death penalty, regardless of the evidence, or that his objections to capital punishment would prevent him from making an impartial decision as to guilt."

We cannot agree. In analyzing the record I find that appellant's rights were fully protected, and that Harrison was properly questioned as to his commitment to vote against the death penalty. The relevant questioning and answering follows:

## DONALD L. HARRISON

Q. (By Prosecutor) The defendant in this case is charged with capital murder. There are only two punishments for the offense of capital murder and that is either death or life in the penitentiary.

Now, do you have conscientious scruples against the infliction of the death penalty as a punishment for crime?

A. I don't know what that means.

Q. Let me ask you if you, personally, sitting as a juror, could ever vote so as to inflict the death penalty?

A. No, I don't think I could.

Q. That is a definite prejudice or feeling that you have that you would not change? You just don't feel like you would be entitled to take another person's life in that fashion.

A. (Venireman nods.)

Q. Okay, you could not?

A. No. I could not.

MR. WILSON: We challenge, Your Honor.

THE COURT: The defense have any objections?

MR. DICKENS: We don't have any questions.

THE COURT: All right.

The Court feels that the State's challenge for cause is qualified in this cause and supported by the evidence.

You will be excused, then, Mr. Harrison. Thank you very much. (R. 711–12).

Straightforward application of the *Witherspoon* line of cases as enunciated in *Adams* leads me to one self-evident conclusion: Harrison entertained reservations about capital punishment which would have prevented him from making an impartial decision as to defendant's guilt.[2] *Witherspoon* mandates no precise questions and answers. The test is "not to be applied with the hypertechnical and archaic approach of a 19th Century pleading book, but with realism and rationality."[3] While the mere demeanor of a venireman cannot contradict his express words so as to give them a meaning in opposition to that which they state, nevertheless, in those instances where the meaning is apparent, elements such as attitude and tone of voice are relevant factors in conveying the precise message intended.[4] The trial judge and counsel were present, with the opportunity to observe and further question Harrison. Here, we think the express words brought forth this message loud and clear: Harrison's attitude toward capital punishment would have prevented him from making an impartial decision on both the guilt and penalty facets of the trial. Moreover, the action of the trial judge (who had seen and heard) in excusing the juror, and appellant's counsel's failure to object, emphasize the appreciation of those who were present that Harrison's views concerning capital punishment would substantially impair the performance of his duties as a juror in this case.

There were five veniremen whose exclusion is challenged. The majority, having concluded that Harrison was improperly excused for cause, did not find it necessary to discuss the challenges to Lipscomb, Wallace, Cox and Vernon. The relevant voir dire examination of each is reproduced in the

2. This was the narrow issue involved in *Witherspoon*, 391 U.S. 512 at 513, 88 S.Ct. 1772 at 1772. See also footnote 21, 391 U.S. 522, 88 S.Ct. 1777.

3. *Ashe v. Swenson*, 397 U.S. 436, 444, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469.

4. *Tezono v. State*, 484 S.W.2d 374, 383–384 (Tex.Cr.App.1972).

Appendix. *Lipscomb* stated that he would automatically vote against the imposition of the death penalty. *Wallace* affirmed that she did not believe in the death penalty and that her feelings were so strong that she could not be involved. *Cox* made no "bones" about it. She was opposed to the death penalty and she would never vote to assess it. *Vernon* equivocated when first questioned, before concluding that in the final analysis she could not vote to impose a death penalty. Each of these excluded veniremen made it "unmistakably clear" that they could not abide by Texas law as it elated to the death penalty. They were thus properly excluded under *Witherspoon*.

In a larger sense, this case emphasizes the frustration of states in their effort to enforce their constitutionally valid capital punishment statutes. The majority holds that *Witherspoon* requires it to intervene to set aside the death penalty in this episode of murder, the nature of which all of us agree is so gruesome that we "gladly refrain from repeating." I think the conclusion is completely without support on the record.

The State of Texas had every right to insist that any juror whose views on capital punishment would substantially impair the performance of his duties as a juror be excused for cause. The State exercised that right and challenged five jurors. The trial court was imminently correct in sustaining each challenge.

In the opinion of this court, written by Judge Gee in *Burns v. Estelle*, 512 F.2d 1297 at 1302, we note this language:

> We cannot close without voicing our dissatisfaction at the unfortunate result to which logic and our lights on *Witherspoon* have driven us. Indeed, it is with

something like agony—though only a pale shadow of what must have been felt by the victim of Burns' ghastly crime—that we intervene to set aside in part the operation of state policy and procedures aimed at preventing further atrocities of this kind. Nor do we retreat an inch from our observation in *Spinkellink v. Wainwright*[5] that "the State also enjoys the right to an impartial jury ... and impartiality requires not only freedom from jury bias against the accused and for the prosecution, but freedom from jury bias for the accused and against the prosecution." After all, the prosecution speaks in some degree for Burns' helpless and pitiful victim and to that degree justly claims in his right.

But the requirements of *Witherspoon* are clear, and the Supreme Court has made equally clear in later decisions that it will not countenance their grudging or ungenerous application.

I appreciate the difficulty of any endeavor to synthesize a precise *Witherspoon* rule, but conclude, without hesitation, that a faithful observance of Supreme Court authority does not require this court to intervene and set aside the death penalty in this case.[6]

With deference, I dissent, and would dismiss the habeas petition in its entirety.

---

5.  442 U.S. 1301, 99 S.Ct. 2091, 60 L.Ed.2d 649 (1980).

6.  An examination of the facts of *Burns v. Estelle*, 592 F.2d 1297 (5th Cir. 1979), 626 F.2d 396 *en banc* (1980), reveals clear distinctions. There, the prospective juror (Mrs. Doss) testified only that the presence of the penalty would "affect" her deliberations, with little or no indication of how profound that effect would be. Defense counsel desired to question her fur-

ther; the trial court abruptly "cut off" further questioning. *Here*, Harrison stated that he did not think he could ever vote to inflict the death penalty, and in response to further questioning agreed that *he could not* vote to take another person's life. It is difficult to psychoanalyze a person's thinking, but the message from Harrison contains what I consider to be unequivocal avowals that he could not vote for the death penalty.