Joseph L. PEREZ, Petitioner,

v.

The PEOPLE of the State of Colorado, Respondent.

No. 85SC68.

Supreme Court of Colorado, En Banc.

Nov. 9, 1987.

David F. Vela, State Public Defender, Douglas D. Barnes, Deputy State Public Defender, Denver, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Virginia Byrnes Horton, Asst. Atty. Gen., Denver, for respondent.

ROVIRA, Justice.

A jury convicted defendant of theft, § 18–4–401, 8 C.R.S. (1978 & 1984 Supp.), and second-degree forgery, § 18–5–103, 8 C.R.S. (1978 & 1984 Supp.), in the Pueblo County District Court. The court entered judgment and sentenced defendant to terms of three years for the forgery conviction, and five years with one year of parole for the theft conviction. The court of appeals affirmed defendant's convictions. *People v. Perez,* 701 P.2d 104 (Colo.App. 1985). Because we conclude that the prosecution's improper use of a defense-retained expert in its case-in-chief was prejudicial to defendant, we reverse the judgment of the court of appeals and remand for a new trial.

I.

On October 23, 1980, a man using the name "Fred Garcia" opened a checking account at the Park National Bank (Park National) in Pueblo with a $200 cash deposit. Later that day, he deposited into the account a $5,000 check drawn on the United Bank of Pueblo (United Bank) account of Douglas Bratton. During the following four days, the same man used the deposit receipt Park National had issued him to cash four checks in the amounts of $5,000, $4,500, $1,000 and $900.

On October 27, United Bank officials notified Park National that it would not pay the Bratton check due to insufficient funds. Shortly thereafter, it was discovered that the Bratton check had been forged and that the four checks drawn on the Garcia account (for a total of $11,400) had all been cashed on the basis of the single $5,000 deposit receipt.

Approximately two weeks later, an employee of Park National observed the defendant at a restaurant and recognized him as the man who had opened the Garcia account. Defendant was subsequently arrested. Two Park National tellers identified defendant from a photographic lineup as the individual who had cashed checks on the Garcia account.

Investigators obtained handwriting exemplars from the defendant and submitted them with the checks and account card (collectively the "questioned documents") to Howard Rile of the Colorado Bureau of Investigation (CBI). After comparing the questioned documents with defendant's exemplars, Rile was of the opinion that defendant had probably written seven of the eight documents, but he was unable to make a positive identification.

In January of 1982, defendant's attorney retained Andrew J. Bradley, a handwriting expert, to analyze the various documents in preparation for trial. Bradley examined only photocopies of the questioned documents, and reached a tentative conclusion that the questioned documents were probably not written by the defendant. He was unable to render a final opinion without examining the original documents.

The defendant later reached an agreement with the prosecution, under the terms of which he pleaded guilty to the theft charge and the trial court dismissed the forgery charge. Prior to sentencing, however, the court allowed defendant to substitute new counsel and entertained defendant's motion to withdraw his guilty plea pursuant to Crim.P. 32(d). The court held a hearing, ruled that defendant's plea was not voluntary, and granted defendant's motion. The court reinstated the forgery charge and set the case for trial. Bradley testified at the hearing on defendant's behalf regarding his analysis of defendant's handwriting.

Subsequent to the 32(d) hearing, defendant's attorney arranged for the original questioned documents to be examined by Bradley. He examined the originals but did not alter his opinion that the defendant had not written them.

In May of 1982, Bradley obtained several "course of business" writings from defendant, consisting mostly of checks defendant had written on his own account. In light of the new evidence, Bradley changed his opinion and concluded that defendant had written the questioned documents.

As a consequence, the defense decided not to call Bradley as its expert witness at trial. The prosecution, however, sought to endorse Bradley as its own expert. In testimony out of the presence of the jury, Bradley revealed that sometime after deciding that defendant had written the questioned documents he had been in contact with Rile, the CBI expert, regarding his analysis. He also revealed that he had discussed the matter with the district attorney and had not informed defense counsel of this contact until the day of the trial. Bradley conceded that he considers himself an agent of the attorney who hires him and that defense counsel in this case had never authorized him to speak with the prosecution.

Over objection by the defense, the trial court permitted Bradley to testify during the prosecution's case-in-chief, and the prosecution called no other experts at that time. The defense presented the testimony of Henry Silver, a handwriting expert, who offered the opinion that the defendant had not written any of the questioned documents. The prosecution later called Rile to rebut Silver's testimony, and Rile testified that, in his opinion, the defendant had probably written seven of the eight questioned documents.

The defendant contends that the prosecution's use of Bradley during its case-in-chief violated his right to effective assistance of counsel as well as the attorney-

client privilege. We need address only the former claim.

## II.

Our analysis of this case is governed by our recent decision in *Hutchinson v. People*, 742 P.2d 875 (Colo.1987), in which we held that the prosecution's use of a defense-retained expert during its case-in-chief, absent compelling circumstances or waiver, violated the defendant's right to effective assistance of counsel. *Hutchinson*, 742 P.2d at 879. We held further that such use of a defendant's expert ordinarily should give rise to relief only upon a specific showing that the defendant suffered prejudice thereby, and we adopted the test announced in *Strickland v. Washington*, 466 U.S. 668, 691–96, 104 S.Ct. 2052, 2066–69, 80 L.Ed.2d 674 (1984), to assess the effect of the improper testimony: "Whether there is a reasonable probability that, absent the improperly used witness, the fact finder would have had a reasonable doubt respecting guilt." *Hutchinson*, 742 P.2d at 886.

## A.

■ We find first that no compelling circumstances existed which permitted the prosecution to call Bradley during its case-in-chief and that the defendant did not waive his right to object to Bradley's testimony.

We recognized in *Hutchinson* that some circumstances may justify the prosecution's use of a defense-retained expert in its case-in-chief as when, for example, "the prosecution could not obtain other competent experts in the field of handwriting analysis." 742 P.2d at 886. Our examination of the record below reveals no such compelling justification.

The prosecution decided to call Bradley as its own witness after it learned that he held an opinion favorable to its case and that he had considered a substantial number of defendant's course of business writings in formulating his opinion. Because the prosecution's expert, Rile, had not considered those writings, but instead relied upon fewer and less telling exemplars, Rile

was unable to express as much certainty in his opinion as Bradley was that the defendant had written the questioned documents. As a consequence, the prosecution relied on Bradley as its sole expert during its case-in-chief and reserved Rile as a rebuttal witness.

The facts below are similar to those we addressed in *Hutchinson*, in which the defense-retained expert requested Hutchinson, the defendant, to provide handwriting samples and specifically asked him to use certain words which had been misspelled on the forged documents. The expert noted that Hutchinson misspelled two words in precisely the manner they were misspelled on the forged documents, and his testimony to that effect was thus more persuasive than the testimony of other experts who had not conducted similar spelling tests. We found that to be an insufficient justification for permitting the prosecution to call that expert: "[W]e see no justification in permitting the prosecution to use a defense expert simply because its own experts failed to conduct their own tests in a manner that could have produced results equivalent to those of the defense expert." 742 P.2d at 887. Although the present case involves the defense-retained expert's use of samples not made available to the prosecution, we find the reasoning of *Hutchinson* equally applicable in these circumstances.

■ Further, the fact that the defendant called Bradley to testify at the 32(d) hearing did not constitute a waiver of defendant's right to object to the prosecution's use of Bradley during its case-in-chief.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Supreme Court held that, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* at 748, 90 S.Ct. at 1469. *Accord King v. People*, 728 P.2d

1264 (Colo.1986). Because of the importance of the right at issue, we will "indulge every reasonable presumption against a waiver...." *King,* 728 P.2d at 1268. In this case, defendant's counsel could not foresee that the expert whom he retained would be called by the prosecution as its expert during its case-in-chief. As a result, defendant cannot fairly be said to have knowingly relinquished his right to prevent Bradley's appearance at trial.

In addition, finding a waiver under these circumstances would be especially troubling for two reasons. First, it has long been established that "it would be intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968). In *Simmons,* the Court held that a defendant's testimony at a suppression hearing, utilized to protect his fourth amendment rights, could not later be used against him at trial, in violation of his fifth amendment privilege against self-incrimination. Here, the defendant offered Bradley's testimony at the 32(d) hearing in support of his claim that his previous counsel had rendered constitutionally ineffective assistance. To find that he thereby waived his right to prevent Bradley from testifying during the prosecution's case-in-chief would put too high a price on his use of the 32(d) hearing to protect his right to effective assistance of counsel.

A second and related problem with finding a waiver in these circumstances is the practical effect it would have on the retention and use of defense experts. In this case, defense counsel continued to seek expert assistance from Bradley following the 32(d) hearing, and it was only after the hearing that defendant provided Bradley with several course of business writings that changed Bradley's opinion. Had defendant faced the prospect of the prosecution calling Bradley as its own expert during its case-in-chief, defendant's counsel would have been wise to discharge Bradley and to secure a different expert to examine defendant's course of business writings. And had he done so, the prosecution never would have had an opportunity to take advantage of Bradley's more careful analysis of defendant's writings. Our finding a waiver in these circumstances would merely encourage that sort of gamesmanship by defense counsel to protect the confidentiality of their pretrial investigations.

We conclude that no compelling reason justified the prosecution's use of Bradley during its case-in-chief and that the defendant did not waive his right to object to Bradley's testimony.

**B.**

Because the prosecution's use of Bradley during its case-in-chief violated defendant's right to effective assistance of counsel, we must now consider whether defendant was prejudiced by the improper testimony. *Hutchinson,* 742 P.2d at 879–80.

There was no dispute at trial that the questioned documents were written by the same person. The prosecution attempted to prove that the defendant was that person through the testimony of Bradley and Rile, on the basis of his handwriting, and through the testimony of several bank employees, who identified the defendant as the person who opened the account or cashed checks on the account.

The defendant claimed that he was in the hospital recuperating from inpatient surgery on his left arm the afternoon the account was opened. A physician from the hospital and a nurse both testified that defendant did indeed have an operation, but neither could verify that defendant had remained at the hospital following surgery. In addition, the defense attempted to show that the crimes were committed by an acquaintance of the defendant's who looked like him. That acquaintance testified in rebuttal that he was in prison in California during the entire period in which the crimes were committed. The defense presented the testimony of the defendant's brother, his wife, and his friend in support of his claims.

Even without the testimony of Bradley, the prosecution produced evidence sufficient to support the jury verdicts. However, we are unable to conclude that there

was no reasonable probability that the jury would have reached the opposite conclusion. *See Hutchinson,* 742 P.2d at 887. Rile testified only that the defendant probably wrote the questioned documents, and in its closing argument the prosecution emphasized that Bradley had earlier been retained by the defense. Without Bradley's testimony—and without the impact on the jury of his having changed his opinion—the jury may have found defendant's case more compelling.

We, therefore, reverse the judgment of the court of appeals and remand the case for a new trial.

ERICKSON, J., dissents and
VOLLACK, J., joins in the dissent.

MULLARKEY, J., dissents.

ERICKSON, Justice, dissenting:

I respectfully dissent. I joined Justice Vollack in his dissent in *Hutchinson v. People,* 742 P.2d 875 (Colo.1987), because I believed, and still believe, that *Hutchinson* was wrongly decided. *Perez v. People,* 745 P.2d 650, (Colo. 1987), illustrates the dangers of using the sixth amendment to bar the prosecution's use of the defendant's handwriting expert.

In this case, the defense expert, Mr. Bradley, testified at a Crim.P. 32(d) hearing that the defendant probably did not execute the forged checks. The testimony was offered to support the defendant's motion to withdraw his guilty plea, which the defendant claimed was not voluntarily entered. The court granted the defendant's motion. Thereafter, the defendant's expert examined the forged checks, which defense counsel obtained from the Colorado Bureau of Investigation, and some of the defendant's cancelled checks, and he changed his opinion by concluding that the defendant's handwriting was on the checks in issue. Needless to say, the defense abandoned Bradley as an expert and sought to prevent the prosecution from using him as an expert at trial.

An expert is neither the alter ego nor the paid advocate for the defendant. His opinion is admitted only because he has expertise and training in a particular field that enables him to offer an opinion that will assist the jury in determining the truth. The exemplars in issue are noncommunicative and are nontestimonial evidence. *Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579–80, 48 L.Ed.2d 39 (1976); *People v. District Court,* 187 Colo. 333, 340, 531 P.2d 626, 630 (1975). The exemplars were properly obtained and should not be secreted in the truthfinding process. The opinion of an expert, who has testified for the defense at an earlier hearing, should not in my view be subject to use only if the defendant so desires.

Other jurisdictions have held that the prosecution's use of opinion testimony of a defense psychiatrist, who was not called by the defendant to testify at trial, was admissible to refute the defendant's insanity defense. In finding such testimony admissible, the courts rejected claims that the admission of the opinion testimony deprived defendants of the effective assistance of counsel under the sixth amendment. *See United States v. Talley,* 790 F.2d 1468, 1470–71 (9th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 224, 93 L.Ed.2d 152 (1986); *Noggle v. Marshall,* 706 F.2d 1408, 1413–16 (6th Cir.), *cert. denied,* 464 U.S. 1010, 104 S.Ct. 530, 78 L.Ed.2d 712 (1983); *Granviel v. Estelle,* 655 F.2d 673, 679–83 (5th Cir. 1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *United States v. Smith,* 425 F.Supp. 1038, 1046–55 (E.D. N.Y.1976), *aff'd,* 556 F.2d 556 (2d Cir.), *cert. denied,* 431 U.S. 958, 97 S.Ct. 2683, 53 L.Ed.2d 276 (1977); *State v. Schneider,* 402 N.W.2d 779, 787–88 (Minn.1987); *State v. Dodis,* 314 N.W.2d 233, 239–41 (Minn.1982); *State v. Carter,* 641 S.W.2d 54, 59 (Mo. 1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983); *Haynes v. State,* 739 P.2d 497, 502 (Nev.1987). These cases are applicable to the prosecution's use of the opinion testimony of the defendant's handwriting expert in this case.

*Hutchinson* distinguished these cases on the grounds that they involved the use of the defendant's expert on rebuttal and not in the prosecution's case-in-chief and that

the expert testimony only addressed the issue of the defendant's sanity and not his guilt. The distinctions, however, are unconvincing. First, the analysis employed in the cases did not depend in any way upon the use of the opinion testimony on rebuttal. *See State v. Craney,* 347 N.W.2d 668 (Iowa) (use of defense expert in state's case-in-chief did not violate the sixth amendment), *cert. denied,* 469 U.S. 884, 105 S.Ct. 255, 83 L.Ed.2d 192 (1984). Second, the resolution of the cases did not depend on the limited use of the expert opinion testimony on the insanity issue but on the disclosure by the expert of confidential communications made to him by the defendant that would implicate the defendant in the charged offense. *See Granviel v. Estelle,* 655 F.2d at 682 ("There is no affirmative evidence in the instant case showing that [the defense expert] revealed any fact or communication between him and [the defendant] showing that [the defendant] committed a *crime of any nature.*"); *United States v. Smith,* 425 F.Supp. at 1054 ("The *statements by the defendant* to his psychiatrist were not admitted to establish the fact of his having committed the murder, but only to establish a basis for the psychiatrist's evaluation of petitioner's sanity at the time of the offense.") (emphasis added). In both *Hutchinson* and the present case, the defense's handwriting expert gave only an opinion, based on his own observations, on whether the defendant signed certain documents; he did not disclose confidential communications made to him by the defendant that would establish the defendant's guilt.

The conclusion that the prosecution's use of the defense's handwriting expert is not unconstitutional finds support in other cases interpreting the United States and Colorado Constitutions. The attorney-client privilege, which protects confidential communications between a client and his attorney, is itself not based on the sixth amendment of the United States Constitution. *Bradt v. Smith,* 634 F.2d 796, 800 (5th Cir.) ("Insofar as it arises in the context of litigation before the courts of the several states, the attorney-client privilege constitutes an evidentiary privilege that is secured by state law, and not by the Constitution or laws of the United States."), *cert. denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106 (1981); *United States v. Valle–Valdez,* 554 F.2d 911, 916 (9th Cir. 1977) ("Errors in such matters as ... rulings on the admissibility of evidence where Fourth Amendment claims are not involved ... generally have been considered 'nonconstitutional.'"). The Supreme Court has held that reciprocal rules of discovery are constitutional. *See Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (upholding a Florida notice-of-alibi provision where there were reciprocal disclosure obligations placed on the prosecution); *People v. District Court,* 187 Colo. 333, 531 P.2d 626 (1975) (holding Crim.P. 16(c) constitutional). Moreover, the production of handwriting exemplars by the defendant is not a critical stage of the prosecution proceedings triggering the defendant's right to counsel. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Sandoval v. People,* 172 Colo. 383, 388–89, 473 P.2d 722, 725 (1970).

Public policy considerations weigh heavily in favor of disclosure of the opinions of handwriting experts. The fundamental purpose of a criminal trial is a fair determination of the truth. *State v. Carter,* 641 S.W.2d at 58. The prosecution does not have a fair opportunity to examine the defendant's handwriting because the defendant generally does not desire to cooperate with the prosecution and may attempt to disguise his handwriting to avoid identification. Any prejudice to the defendant can be substantially reduced by excluding from the jury information that the expert was originally employed by the defendant. *See id.* at 58 ("The trier of the fact must not be 'so effectively deprived of valuable witnesses as to undermine the public interest in the administration of justice.'") (quoting *Pouncy v. Florida,* 353 So.2d 640, 642 (Fla. App.1977)); *see also State v. Schneider,* 402 N.W.2d 779, 788 (Minn.1987) ("Experts are not the paid harlots of either side in a criminal case and should not be portrayed

in such a light."); *People v. Speck*, 41 Ill.2d 177, 200, 242 N.E.2d 208, 221 (1968) ("A witness is not the property of either party to a suit and simply because one party may have conferred with a witness and even paid him for his expert advice does not render him incompetent to testify for the other party."), *rev'd in part*, 403 U.S. 946, 91 S.Ct. 2279, 29 L.Ed.2d 855 (1971). The prosecution has an affirmative duty to give the defendant exculpatory evidence and it seems only just that the prosecution should be able to use the opinion of a handwriting expert hired by the defendant but not used by the defendant to testify at trial. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Cheatwood v. People*, 164 Colo. 334, 435 P.2d 402 (1967).

A defendant who seeks to introduce the testimony of a handwriting expert may be required to disclose his handwriting exemplars prior to trial. *See* Crim.P. 16 (stating prosecution's discovery powers). Where, as here, a defendant reveals to the prosecution the very facts that he seeks to protect, there is no privacy interest to be protected. It follows that no harm accrues to the defense from seeking a handwriting expert's advice because the underlying factual basis will be revealed to the prosecution's expert. *See State v. Dodis*, 314 N.W.2d 233, 240 (Minn.1982) ("Because the prosecution may 'use' all reports and records that bear on the issue of mental illness, it should have the right to call a defense-retained psychiatrist to testify regarding his findings on this issue. Any other result suppresses evidence that a court or jury needs to know to formulate a just determination concerning the mental illness defense."). With respect to the potential harm to the defendant from the prosecution's use of a defense expert, *State v. Carter*, 641 S.W.2d at 59, stated:

> Defendant was not deprived of his constitutional right to effective assistance of counsel by the court's ruling. The fact that counsel in preparing the defense for his client could possibly choose a psychiatrist who might make a report adverse to counsel's theory of defense, or that in a psychiatric examination a defendant

might speak guardedly or be less than candid with the doctor, knowing that the doctor might turn out to be a witness against him are not considerations of sufficient importance in this case to outweigh and override the stated requirements of fairness, justice and public policy in determining whether a request by the State for disclosure is reasonable....

In concluding that the sixth amendment does not bar the prosecution's use of the opinion testimony of the defendant's handwriting expert, the statements of Judge Weinstein are insightful:

> In sum, it seems undesirable at this time to canonize the majority rule on the attorney-psychiatrist-client privilege and freeze it into a constitutional form not amenable to change by rule, statute, or further caselaw development. Were we to force the State into the rigid format suggested by the petitioner in this case by deciding that New York must, as a constitutional matter, extend privileged status to these communications, we would cut off further experimentation in this area—not only by this State, but by all state and federal courts and legislatures. We cannot say what the ultimate consensus, if any, will be on these policy issues. But it appears inappropriate and unwise at this stage to block potential branches of evolution.
>
> Courts and legislatures must be given reasonable freedom to develop new approaches to questions of testimonial privilege. This subject is currently in a state of development, with increasing pressures for the creation of entirely new privileges, such as the social worker-client and reporter-source, and the expansion of older privileges predicated upon expanding concepts of privacy. At the same time there is continued counterpressures from the compelling interest in the ascertainment of truth in the pursuit of just determinations of legal contests. *See, e.g.*, Federal Rules of Evidence, Rules 102, 401–403, 501, 803(24). For us to force one phase of the law of evidence into the procrustean bed urged by petitioner might be to disserve the

arguably desirable development of more flexible rules of privilege.

*United States v. Smith*, 425 F.Supp. at 1054–55 (concluding that the sixth amendment does not bar the prosecution's use of a defense-retained psychiatrist).

In my view, the attorney-client privilege also does not bar the prosecution's use of the opinion testimony of a handwriting expert consulted by the defendant. So long as the expert does not disclose to the prosecution any confidential communications made by the defendant or defense counsel and testifies only to his opinion on whether the defendant signed the disputed documents, there is no violation of the attorney-client privilege. *Hutchinson v. People*, 742 P.2d 875 (Colo.1987) (Vollack, J., dissenting); *United States v. Pipkins*, 528 F.2d 559 (5th Cir.) (no violation of attorney-client privilege where prosecution called handwriting expert originally hired by defense counsel and expert gave opinion testimony that the defendant signed the disputed document), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976); *see also State v. Craney*, 347 N.W.2d 668 (attorney-client privilege inapplicable to prosecution's use of defense-retained psychiatrist); Saltzburg, *Privileges and Professionals: Lawyers and Psychiatrists*, 66 Va.L.Rev. 597, 635–42 (1980) (discussing why attorney-client privilege should not protect defense psychiatrist's opinion testimony from use by prosecution). In the present case, Bradley, the defense-retained handwriting expert, gave opinion testimony for the prosecution that the defendant signed the forged checks. The expert did not testify to any confidential communications made to him by the defendant or defense counsel. In my view, the opinion testimony of Bradley was properly admitted by the trial court, and the court of appeals decision should be affirmed.

I authorized to say that Justice VOLLACK joins in this dissent.

MULLARKEY, Justice, dissenting:

I respectfully dissent. I believe that the defendant waived the confidentiality of Bradley's opinion by calling Bradley to testify at the Crim.P. 32(d) hearing. Accordingly, I would affirm.

### I.

In two recent cases, this court has held that, absent waiver or a compelling justification, the attorney-client privilege and the sixth amendment right to effective assistance of counsel prevent the prosecution from calling defense-retained experts as witnesses in the prosecution's case-in-chief. *Hutchinson v. People*, 742 P.2d 875 (Colo. 1987) (right to effective assistance of counsel); *Miller v. District Court*, 737 P.2d 834 (Colo.1987) (attorney-client privilege). In both cases, we made it clear that a waiver could be implied from the defendant's words or conduct. In *Miller*, we rejected the People's argument that the defendant had waived the attorney-client privilege simply by placing his mental condition in issue. 737 P.2d at 838–39. We also rejected the People's arguments that waiver had occurred in *Hutchinson*. First, we concluded that the defendant's plea of not guilty did not waive the confidentiality of the expert's opinion. 742 P.2d 875, at 886. Second, we concluded that since the testimony of the defendant's wife, which tended to suggest that someone else had forged the checks, was not offered until after the prosecution's case-in-chief, it could not be construed as an implied waiver. 742 P.2d 875, at 886. Under this reasoning, a waiver of the constitutionally-mandated confidentiality may be inferred from the defendant's decision to call a particular witness (not necessarily the expert in question) before the prosecution calls the defense-retained expert. While I agree that no waiver occurred in *Miller* or *Hutchinson*, I believe that if we are to give any content to the concept of an implied waiver of the confidentiality of a defense-retained expert's opinion, we must find a waiver in this case.

Here, the defense counsel knew that the expert's opinion was tentative at the time he called the expert to testify at the Crim.P. 32(d) hearing. Indeed, the expert was called at that hearing in order to show that the defendant's first trial counsel had

been ineffective because he had failed to follow up on the expert's request to review the original forged checks. The expert's tentative opinion, based on his review of photocopies of the forged checks, was that the defendant had not written them. However, he also testified that it would be necessary for him to see the originals in order to formulate a final opinion, and that the defendant's first attorney had never provided him with the originals.

After the Rule 32(d) hearing, the district attorney submitted the original checks to the defense-retained expert and the expert obtained other checks written by the defendant. After reviewing these documents, his opinion changed and he formed the opinion that the defendant had written the forged checks. This change in the expert's opinion should have come as no surprise to the defense counsel because he knew the expert's opinion was tentative at the time he called him to testify at the 32(d) hearing. The change in the expert's opinion does not change the legal effect of the defendant's voluntary decision to call Bradley as an expert at the Crim.P. 32(d) hearing—by introducing Bradley's testimony at that hearing, the defendant waived the confidentiality of Bradley's opinion.

The majority concludes that there was no waiver because defense counsel could not have foreseen that the prosecution would call Bradley during its case-in-chief. The majority opinion also expresses concern that finding a waiver would force the defendant to choose between constitutional rights and encourage gamesmanship. As explained in part III, I believe that since no improper coercion occurred here, the defendant did waive the confidentiality of Bradley's opinion and was not forced to choose between rights. Further, I think a finding of waiver in this case would discourage, rather than encourage, gamesmanship.

## II.

If this case involved only the attorney-client privilege, it would be clear that, by calling the defense-retained handwriting expert at the Crim.P. 32(d) hearing, the defendant waived the confidentiality of that expert's testimony. *See, e.g., United States v. Alvarez,* 519 F.2d 1036, 1046 (3d Cir.1975) ("[i]f the expert is ... used as a witness on behalf of the defendant, obviously the cloak of privilege ends"); *Tucker v. State,* 484 So.2d 1299, 1301 (Fla.Dist.Ct. App.) (allowing expert to be deposed waived the privilege because "once communications protected by the attorney-client privilege are voluntarily disclosed, the privilege is waived and cannot be reclaimed"), *review denied,* 494 So.2d 1153 (Fla.1986); *see generally* McCormick on Evidence § 93 (E. Cleary 2d ed. 1972); 8 Wigmore on Evidence § 2328 (J. McNaughton rev. ed. 1961).

In a case very similar to the one now before us, the Eleventh Circuit held that since the defendant had waived the attorney-client privilege at a Fed.R.Crim.P. 32(d) hearing, he could not reclaim the privilege at trial. *United States v. Suarez,* 820 F.2d 1158, 1160 (11th Cir.1987). In *Suarez,* as here, the defendant sought to withdraw his guilty plea because his first attorney had not represented him effectively. In *Suarez,* the defendant expressly waived the attorney-client privilege so that his first attorney could testify at the Rule 32(d) hearing, but, after he had been allowed to withdraw the plea, he objected to the prosecution calling his first attorney to testify during its case-in-chief. The Eleventh Circuit rejected the defendant's claim of privilege, stating that:

The purpose of the attorney-client privilege is to promote freedom of consultation between client and lawyer by eliminating the fear of subsequent compelled legal disclosure of confidential communications.... [A]t the point where attorney-client communications are no longer confidential, i.e., where there has been a disclosure of a privileged communication, there is no justification for retaining the privilege. For that reason, it has long been held that once waived, the attorney-client privilege cannot be reasserted. Once [the defendant's first attorney] testified at the hearing to withdraw the guilty plea, the attorney-client privilege

could not bar his testimony on the same subject at trial.

*Suarez,* 820 F.2d at 1160 (footnotes and citations omitted).

In another similar case, *Brown v. State,* 448 N.E.2d 10, 14–15 (Ind.1983), the defendant introduced testimony by a defense-retained polygraph examiner at a hearing held to determine whether she should be tried in the juvenile court or the circuit court. When the prosecution later called the same polygraph examiner as a witness in its case-in-chief, the defendant claimed that his testimony violated her attorney-client privilege. The Indiana Supreme Court agreed that the attorney-client privilege applied to her communications with the polygraph examiner, but held that it had been waived when the defendant called him as a witness at the juvenile court hearing. *Brown,* 448 N.E.2d at 14–15. The court explained that a client "cannot seek admission of privileged communications about a subject at one time and then later resist disclosure of the same communications." *Id.* at 15.

I agree with the reasoning in *Suarez* and *Brown,* and would, therefore, require the defense counsel to make a decision before he puts the expert on the stand. Once the expert is called and has testified, then the prosecution should be able to use the expert in its case-in-chief.

### III.

Thus far, I have considered only the question of whether the defendant waived the attorney-client privilege. In order to affirm the trial court, we would also have to conclude that the defendant had waived the constitutional right to confidentiality described in *Hutchinson v. People,* 742 P.2d 875 (Colo.1987). The majority correctly states that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." At 652 (quoting *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed.2d 747 (1970) (footnote omitted)).

The majority opinion then concludes that the waiver was not knowing because defense counsel could not have foreseen that the prosecution would call Bradley. At 653. I disagree for two reasons. First, I believe defense counsel *could* foresee the prosecutor calling Bradley once Bradley's identity was disclosed at the 32(d) hearing. The defendant and his attorney were aware that once Bradley testified, the prosecuting attorneys would know that Bradley had been retained by the defendant, that his tentative opinion was that the defendant had not forged the checks, and that he was unable to form a final opinion until he studied the original forged checks. With a full awareness that none of these facts would remain confidential if Bradley were called, the defendant still chose to call him. He apparently also gave the prosecution a report prepared by Bradley pursuant to Crim.P. 16. Especially in light of the fact that these events occurred prior to our decisions in *Miller* and *Hutchinson,* I see no reason why defense counsel would not have expected the prosecution to call Bradley as a witness.

Second, the critical question is not whether the attorney could have foreseen the prosecution calling Bradley. The requirement that a waiver of a constitutional right be knowing, voluntary, and intelligent does not mean that defense counsel must accurately predict exactly what will happen if the defendant relinquishes his right. *See, e.g., McMann v. Richardson,* 397 U.S. 759, 770, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970) (requirement that guilty plea be made intelligently does not mean "that all advice offered by the defendant's lawyer withstand retrospective examination"); *Brady,* 397 U.S. at 757, 90 S.Ct. at 1473 (valid guilty plea does not require that the defendant "correctly assess every relevant factor entering into his decision"); *People v. Velasquez,* 641 P.2d 943, 951 (Colo.) ("A defendant is not constitutionally entitled to errorless counsel"), *cert. denied,* 459 U.S. 805, 103 S.Ct. 28, 74 L.Ed.2d 43 (1982). Instead, the analysis should be focused on whether the waiver was coerced. *See, e.g., Brady,* 397 U.S. at 750–55, 90 S.Ct. at 1470–72.

The concern with preventing coerced waivers is illustrated by *Simmons v. United States*, 390 U.S. 377, 389–94, 88 S.Ct. 967, 973–76, 19 L.Ed.2d 1247 (1968). As the majority states, in *Simmons*, the Court made clear that a defendant could not be coerced into giving up one constitutional right in order to protect another. 390 U.S. at 394, 88 S.Ct. at 976. In *Simmons*, the defendant testified at a suppression hearing, but his suppression motion was overruled. The United States Supreme Court's decision that the defendant's testimony was inadmissible at trial was based on the fact that since the only way for the defendant to have established standing was to testify, the "testimony is to be regarded as an integral part of his Fourth Amendment exclusion claim." 390 U.S. at 391, 88 S.Ct. at 975. The Court reasoned that allowing such testimony to be admitted would require the defendant to surrender one constitutional right in order to assert another. 390 U.S. at 394, 88 S.Ct. at 976. However, subsequent federal decisions have held that the *Simmons* reasoning is inapplicable when the defendant did not *have* to make a "Hobson's choice," but instead freely waived one constitutional right in the process of trying to protect another. *See Jeffers v. United States*, 432 U.S. 137, 153 & n. 21, 97 S.Ct. 2207, 2217–18 & n. 21, 53 L.Ed.2d 168 (1977) ("alleged Hobson's choice between asserting the Sixth Amendment fair trial right and asserting the Fifth Amendment double jeopardy claim is illusory" since problem could have been avoided if petitioner had made different pretrial motions); *United States v. Melanson*, 691 F.2d 579, 584 (1st Cir.) (since it is not necessary that the defendant "refer to the facts of the case" in order to protect

Eighth Amendment bail rights, *Simmons* does not require exclusion of uncoerced, incriminatory statements defendant made at bail hearing), *cert. denied*, 454 U.S. 856, 102 S.Ct. 305, 70 L.Ed.2d 151 (1981); *United States v. Dohm*, 618 F.2d 1169, 1173–74 (5th Cir.1980) (same).

I believe that in this case the apparent "Hobson's choice" was created by the uncoerced decisions of the defendant and his attorney. Bradley was not the defendant's only witness or even a crucial witness. Defense counsel chose to call Bradley as one of many witnesses[1] at the 32(d) hearing, without showing him the original checks he needed in order to render a definite opinion; he chose to ask Bradley for his preliminary opinion at that hearing, in spite of the prosecutor's objection; and he chose to show Bradley the defendant's course of business writings after the 32(d) hearing. It was this set of circumstances, rather than the nature of a 32(d) hearing, that created the defendant's dilemma. Just as in *Jeffers*, where the defendant could have avoided having to choose between constitutional rights by requesting that his trial be severed from that of his co-defendants, here the defendant could have avoided the problem that occurred by showing Bradley the original checks and course of business writings before calling him at the 32(d) hearing or never showing him those documents. Therefore, there is no *Simmons* dilemma of a defendant being forced to choose between constitutional rights.

The majority also expresses concern that a finding of waiver would encourage "gamesmanship." At 653. I disagree. I would require defense counsel to make the decision about whether to keep the defense-

---

1. The defendant called eight witnesses at the Crim.P. 32(d) hearing. The testimony suggested a complete lack of trial preparation by the defendant's first attorney. For example, it appeared that the defendant's first attorney had not investigated the case, had not interviewed potential witnesses, had not informed the defendant of his right to a jury trial, had told the defendant a plea of nolo contendere meant he was not guilty, had told the defendant he had to either go to trial without a lawyer or plead nolo contendere, had requested continuances over the defendant's objections due to his lack of preparation, had lied to or misled the defendant as to the scope and results of his investigations, and had not told him the plea agreement meant he would have to repay $12,000. The hearing appears to have focused on the attorney's failure to investigate leads suggesting that another man had committed the forgery and his general failure to communicate with the defendant. The fact that the first attorney failed to follow upon on Bradley's phone call was just one of many pieces of evidence showing the attorney's incompetence.

retained expert's opinion confidential prior to calling that expert at any stage of the proceeding. Under such a rule, once the expert is questioned, his identity and opinion are no longer confidential, and no amount of "gamesmanship" can restore their confidentiality. Further, such a rule would discourage gamesmanship by preventing defendants from "trying out" different witnesses at pretrial proceedings and then excluding them if their testimony proved to be unsatisfactory for any reason.

### IV.

In conclusion, since the defendant knowingly, intelligently, and voluntarily chose to call Bradley as a witness at the 32(d) hearing and to ask him for his opinion, I would conclude that he impliedly waived the confidentiality that would otherwise have protected Bradley's opinion. Since he was not forced to make Bradley's opinion public in order to vindicate his right not to be convicted based on an involuntary guilty plea, *Simmons* is inapplicable.